UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

─────────────────────────────────────────────────────────

JOHNNIE CARPRUE,

        Petitioner,

        v.                              Case No. 05-CV-503

PHIL KINGSTON,[1]

        Respondent.

─────────────────────────────────────────────────────────

# ORDER

Petitioner Johnnie Carprue seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his December 3, 2001, conviction of second-degree sexual assault. Carprue was sentenced to 25 years in prison for this crime and is currently confined at the Waupun Correctional Institution. For the following reasons, the court will deny Carprue's petition.

# BACKGROUND

The Supreme Court of Wisconsin set forth a thorough statement of the pertinent facts in its decision dated July 9, 2004.

> Johnnie Carprue was released from the Milwaukee House of Correction (HOC) on May 9, 2001. A day later, Carprue was taken into custody on a charge of second-degree sexual assault. The trial on this charge was held between August 29 and September 4, 2001, in the Milwaukee County Circuit Court, Jacqueline D. Schellinger, Judge.
> The complaining witness, T.B., and Carprue provide sometimes similar, sometimes vastly different accounts of the events that transpired following Carprue's release. Both agree that T.B. became

---

[1] Pursuant to Rule 2 of the Rules Governing Section 2254 Cases, a federal habeas petition must name as respondent the state officer who has custody of the petitioner.

acquainted with Carprue through her sister's boyfriend, who was also serving time in the HOC. While Carprue was confined at HOC, his communication with T.B. was primarily by telephone, although T.B. visited Carprue on two or three occasions and also saw him at a court appearance.

As Carprue's release date drew near, he needed a place to stay. Because Carprue was to be a subject of "in-house" monitoring under the auspices of In-House Correctional Services, he was required to have a fixed address for monitoring purposes. Carprue attempted to make living arrangements with his aunt, but the arrangements fell through. T.B. offered Carprue a place to stay, even though she had only recently moved to Milwaukee and was living with her sister. Carprue accepted, and when he was released on the afternoon of May 9th, he was taken to T.B.'s sister's residence.

Carprue did not stay at that address long. The sister's boyfriend did not want him there. Carprue left, he called T.B. later that evening, and the two agreed to meet. Ultimately, they proceeded to Carprue's aunt's residence.

At this point, the accounts begin to diverge. T.B. testified that when they arrived at the aunt's residence, they watched a movie in the living room. She indicated she fell asleep during the movie and woke up a few hours later to braid Carprue's cousin's hair before he left for school. She testified that she and Carprue did not engage in physical contact of a sexual nature up to that point.

Carprue offers a different version of how the two spent the late evening and early morning hours of May 9th and 10th. Carprue testified that the two were in the living room for only a brief period. During that time, the two were "kissing and hugging," and T.B.'s pants were unbuttoned. When Carprue's aunt entered from outside, Carprue threw his coat over T.B. so that she could fasten her pants. At about 3:30 in the morning, Carprue and T.B. then entered a bedroom where Carprue's cousin and a friend were playing video games. Carprue testified that during the time in the bedroom with the others, he was fondling T.B.'s vagina without objection, and that her pants were again unbuttoned.

Despite the inconsistencies in their testimony, both Carprue and T.B. recount that around 5:00 a.m., T.B. braided Carprue's cousin's hair. Both agree that thereafter T.B. entered a back bedroom of the apartment.

T.B. testified that she was initially alone in the room and that she removed her pants to be more comfortable. She then lay down on a makeshift sleeping pallet atop one blanket and beneath another, and fell asleep. T.B. testified that she awoke when she sensed the presence of Carprue lying next to her. She said Carprue asked for a

kiss and she obliged. He then asked if "he could have some." T.B. took this to mean sexual intercourse. She testified that she answered "no" and reminded him, as they had discussed in their telephone conversations, that her religious beliefs precluded her from having pre-marital sex. According to T.B., he responded "You not going to give me none?" and she again answered in the negative, to which he grinned and told her he was going to "take some" anyway. T.B. testified that at first she thought he was kidding, but soon knew he was serious when he pinned her down and raped her, overcoming her repeated verbal and physical attempts to stop him.

Carprue presented a starkly different picture of events. In his version, he briefly left T.B. alone in the back bedroom, and when he returned, he lay next to her on the makeshift bed. T.B. had not fallen asleep. He testified that they talked for a while. Carprue denied asking T.B. for a kiss, and testified that she initiated kissing. He then recited in explicit detail alleged consensual sexual activities. He indicated that at some point their sexual intercourse became "rough," but nonetheless remained consensual.

In Carprue's version of events, he exited the bedroom, which had no door separating it from the kitchen, and met his aunt who was entering the kitchen from the living room. He and his aunt had a brief conversation regarding breakfast; then Carprue went back into the bedroom. T.B. showed Carprue her coat, which had blood on it. The coat had apparently been underneath them during sexual intercourse. T.B. became angry and they had an argument. According to Carprue, T.B. was upset because the two were not supposed to have "gone that far" and that she had violated the tenets of her religious beliefs. Carprue testified that he explained to her that she did not have to confess her transgressions and that no one would find out. Carprue testified that she calmed down and said she still wanted to accompany him to his mother's house later that morning. The two fell asleep. Around noon, they awoke and T.B. left.

For her part, T.B. recalls that Carprue abruptly ended the nonconsensual intercourse when he heard his aunt enter the kitchen. She testified that, when he left, she went to the bathroom to clean up the blood on her clothing, but eventually gave up and returned to the bedroom to gather her jacket and purse. However, Carprue would not let her leave because she was so upset, and she eventually appeased him by lying down with him, only to sneak out when he fell asleep.

After she left, T.B. testified that she returned to her sister's apartment. She did not call the police. She talked with her sister about what happened, however, and her sister convinced her to seek medical treatment at the hospital. A nurse examined T.B. and later offered an expert opinion that the injuries she observed in T.B.'s

vaginal area were consistent with forceful sexual contact and that the act of sexual intercourse was forced.

A nurse at the hospital called the police. Detective John Reesman of the Milwaukee Police Department testified that he arrived at Mt. Sinai Hospital where an initial investigation had begun. After being interviewed, T.B. led officers to Carprue's aunt's residence, where she pointed out Carprue, who happened to be sitting on the porch. By the time Detective Reesman parked his squad car and arrived at the front door, Carprue was no longer on the porch. The detective knocked on the door, and Carprue's aunt answered. The detective was permitted to enter the apartment and, once inside, saw Carprue in the kitchen at the rear of the apartment. When Carprue spotted Detective Reesman, who was accompanied by a uniformed police officer, he fled. He ran down a back stairwell that led to the building's basement. Carprue was eventually discovered hiding under the front porch, which he accessed through a window in the basement. When asked at trial why he fled, Carprue responded:

> Cause I was supposed to be at In-House at one house, I knew I was violating it back at my auntie's house. I was supposed to be expedited [sic] to Gary [Indiana] for charges down there, that was dropped while I was in custody with the Milwaukee Police Department.
>
> But I was informed also, that once I got out of custody, they may bring the warrant back up.
>
> So it was like--I was both scared from violating being at another house while I was on In-House, and the real thing, my thinking they was trying to transfer me back to Gary.

Earlier in the proceeding, T.B. testified that Carprue told her that he would be released from the HOC to "house arrest." After a sidebar with counsel, Judge Schellinger paused to clarify what "house arrest" entailed. She explained to the jury that "house arrest" was electronic surveillance, in which the subject of the surveillance is required to wear a "bracelet" that connects to a phone device so that when a monitoring agent calls, the agent can be sure that the subject is present at the residence.

Later, with the jury absent, Carprue explained to the judge that he was not under electronic surveillance, as stated by the court. He was subject to an "in-house" monitoring system.

During Carprue's testimony the following day, when the "in-house" system again came up, Judge Schellinger called for a

sidebar with counsel and then acknowledged to the jury that her earlier explanation was in error. She explained that "in-house" monitoring does not involve a "bracelet." Rather, it simply requires a subject to be at a specified location when a monitoring agent calls. Judge Schellinger described the pertinent characteristics of "in-house" monitoring and took judicial notice of these facts.

When Carprue finished testifying, the jury left the courtroom for lunch. After the jury was out, Judge Schellinger stated: "I want to make sure that the questions that were asked and answers that were given, conform to In-House Correctional Services reports." Judge Schellinger then called Kenneth Morrow, the director of In-House Correctional Services to the stand. Morrow was present because he was on Carprue's witness list in the capacity of "custodian of records" of Carprue's "in-house" file. The judge questioned him about "in-house" procedures.

First, Judge Schellinger inquired about documentation in Carprue's file relating to his two addresses. The file contained the aunt's address as well as T.B.'s sister's address, with the former having been "Xed out" in favor of the latter. Morrow testified that he did not know why the placement was changed. Morrow's testimony confirmed that law enforcement authorities had Carprue's aunt's address in Carprue's file, so that, had they been attempting to track Carprue down, they could have started with her address.

Second, Judge Schellinger inquired into the technological compatibility of the "in-house" monitoring program with certain optional phone company services such as call waiting. During his testimony, Carprue had alluded to the fact that he had difficulty setting up telephonic monitoring at his aunt's house because she had certain phone company services that were incompatible with the "in-house" program's telephone monitoring system. Carprue's explanation suggested that the "in-house" agents could not monitor him over the phone if certain phone services were present. Morrow testified that if there were any such incompatibility, someone from "In-House" would stop by in person to check on the subject. At the same time, Morrow confirmed that In-House Correctional Services preferred that a phone line not have "call management, where a computer answers the phone instead of a person."

Finally, Judge Schellinger asked Morrow about the procedure employed when "In-House" personnel are unable to contact a subject of "in-house" monitoring, as well as what information subjects of monitoring would know about the consequences of a failure to make contact. Morrow's answers suggested that Carprue had been informed before being placed on "in-house" monitoring that, if he could not be contacted, the service would report his violation to the court that

ordered the monitoring. The police would not be called. However, Morrow conceded that, in some cases, the police could be called if authorities had obtained a bench warrant.

All this took place while the jury was absent from the courtroom. After Morrow stepped down, Judge Schellinger explained:

> The court really never gets involved in the examination of witnesses, particularly in front of a jury, but there have been things said by the defendant in this case which are inconsistent with the way In-House operates.
> That's why I have asked Mr. Morrow to come up here.
> I'm not commenting on whether or not the defendant has been untruthful or whatever, his understanding is different than that which is the case.

During the jury's absence, Judge Schellinger also questioned Carprue regarding a letter he had written to a judge in a different case. In the letter, Carprue requested leniency, and referred to his fiancee. There were some inconsistencies between the letter and Carprue's testimony. The letter was in a file that Judge Schellinger may have used to explain to the jury why Carprue had been in the Milwaukee County HOC, but this is not clear. Several times Judge Schellinger instructed the jury that it was not to accord any significance to the fact that Carprue had been in the HOC and on "in-house" monitoring. In order to defuse any lingering suspicion about his status, Judge Schellinger explained that "Carprue was the subject of a criminal complaint being filed in a traffic matter on February 23rd, 2001." The court in the other case released Carprue on a signature bond and, as a condition of the bond, Carprue was to be placed on "in-house" monitoring.

When the jury returned to the courtroom, the State called Kenneth Morrow as a rebuttal witness. The State asked Morrow what the "in-house" program tells its subjects about consequences of violating the terms of release. Morrow responded in much the same manner as when the jury was not present. Carprue's counsel thencross-examined Morrow, getting him to admit that the subject of in-house monitoring is never expressly informed that the police would not be informed if the subject of monitoring could not be contacted.

The jury returned a guilty verdict on second-degree sexual assault. Carprue appealed. *State v. Carprue*, 2003 WI App 148, 266 Wis. 2d 168, 667 N.W.2d 800. He alleged that the circuit court committed reversible error by calling and questioning Morrow and by

-6-
Case 2:05-cv-00503-JPS   Filed 05/15/06   Page 6 of 16   Document 24

> questioning Carprue regarding the letter he wrote to another judge. He also challenged his conviction on ineffective assistance of counsel grounds, based on his attorney's failure to object to the court's actions. *Id.*, ¶ 7. The court of appeals reversed Carprue's conviction, holding that Judge Schellinger's conduct demonstrated that the court was acting as a "hinting advocate" for the prosecution. *Id.*, ¶ 16. It held that Judge Schellinger's conduct "threatened the fairness of the trial," *id.*, ¶ 13, and exceeded the parameters of acceptability, resulting in "the appearance of advocacy and partisanship." *Id.*, ¶ 18. The court of appeals concluded that Judge Schellinger "could no longer maintain impartiality and objectivity." *Id.*

*State v. Carprue*, 2004 WI 111, ¶¶ 4-27, 274 Wis. 2d 656, 661-70, 683 N.W.2d 31, 33-38 (footnotes omitted).

The Supreme Court of Wisconsin held that Carprue waived his right to raise the claim that Judge Schellinger exceeded the authority granted to her by Wis. Stat. § 906.14, that Carprue could not demonstrate that prejudice resulted from his trial counsel's failure to object to Judge Schellinger's actions, and that Judge Schellinger's actions were not so extreme as to deprive Carprue of his due process rights. *Id.* at ¶¶ 64-65. Accordingly, the court reversed the appellate court's decision and reinstated Carprue's conviction. *Id.* at ¶ 69.

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, governs the grant of a writ of habeas corpus. Under § 2254(d), if a constitutional claim was adjudicated on the merits by the state courts, a federal court may only grant habeas relief based on that claim if the state court's decision is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the U.S. Supreme Court, or if the state court's determination of

the facts was unreasonable in light of the evidence presented. *Id.* A state court decision must be more than incorrect from the point of view of the federal court; AEDPA requires that it be "unreasonable," which means something like lying well outside the boundaries of permissible differences of opinion. *Williams v. Taylor*, 529 U.S. 362, 410-12 (2000). Findings of fact made by the state courts are presumed correct and are rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000).

Carprue raises three claims in his federal habeas petition. He claims that the trial court judge, Judge Schellinger, violated his rights to due process by (1) investigating his background and questioning him on the witness stand, and (2) by calling and questioning a witness, Kenneth Morrow, the director of In-House Correctional Services. Carprue's final claim is that his trial counsel was ineffective within the meaning of the Sixth Amendment for not objecting to these actions. The Supreme Court of Wisconsin addressed these claims in its July 9, 2004, decision.

Carprue's brief in support of his petition does not assert that the Supreme Court of Wisconsin's decision is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the U.S. Supreme Court, or that the court's determination of the facts was unreasonable in light of the evidence presented. Carprue's brief, except for the cover and date, is identical to the brief he submitted to the Wisconsin Court of Appeals in 2002. (Resp't Br. in Opp., 3). Regardless, for the reasons stated below, the court concludes that the Supreme Court of Wisconsin's decision was not contrary to, and did not involve an

unreasonable application of federal law, as determined by the U.S. Supreme Court, nor did it result in a decision that was based on an unreasonable application of the facts in light of the evidence presented.

In its decision addressing Carprue's claims, the Supreme Court of Wisconsin first determined that Carprue waived the claim that Judge Schellinger exceeded the authority granted to her by Wis. Stat. § 906.14, which states that a judge may call and question a witness. The court correctly noted that § 906.14(3) explicitly grants a party the authority to object to a judge's actions. The court determined that given the explicit authority to object to a judge's questions under the § 906.14(3), Carprue could have challenged the trial judge's calling and questioning Morrow, but he did not timely object to the judge's actions. *Carprue*, 2004 WI 111, ¶¶ 35-36. Since Carprue did not timely object, the court held that he waived his right to raise this issue on appeal. *Id.* at ¶¶ 35-46. Carprue does not demonstrate that the court's holding is contrary to, or an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

The Supreme Court of Wisconsin has long held that issues not raised in the trial court are deemed waived. *Apex Elec. Corp. v. Gee*, 217 Wis. 2d 378, 384, 577 N.W.2d 23, 26 (1998); *Ollinger v. Grall*, 258 N.W.2d 693, 699 (1977); *Frankovis v. State*, 287 N.W.2d 791, 796 (1980). Here, the court's determination that Carprue waived any claim that the trial court judge exceeded the authority granted to her by § 906.14 by not objecting at trial rests on a state ground consistent with established federal law. *See, e.g.,* Fed. R. Evid. 103; *see also United States v. Billups*,

692 F.2d 320, 327 (4th Cir. 1982) (holding that pursuant to Fed. R. Evid. 614, which is substantially identical to Wis. Stat. § 906.14, a timely objection is required to preserve any claim of error for appeal). After determining that Carprue had waived the right to appeal the trial judge's actions in light of § 906.14, the court properly addressed Carprue's claims of error in the rubric of ineffective assistance of counsel for failing to object to the trial judge's actions. *Carprue*, 2004 WI 111, ¶¶ 47-56.

In addressing Carprue's claim of ineffective assistance of counsel, the court correctly applied the two-part analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The court rejected Carprue's assertion that prejudice should be presumed, and concluded that Carprue was not prejudiced by his trial counsel's failure to object to Judge Schellinger's conduct, which occurred outside of the jury's presence. *Carprue*, 2004 WI 111, ¶¶ 48-56.

Carprue does not show that the Supreme Court of Wisconsin unreasonably applied the standards set forth in *Strickland* with respect to his ineffective assistance of counsel claim. The court correctly identified and articulated the standards under *Strickland*. "Under this framework, Carprue must demonstrate (1) that his counsel's representation was deficient and (2) that this deficiency prejudiced him so that there is a probability sufficient to undermine our confidence in the outcome of the case." *Carprue*, 2004 WI 111, ¶ 48 (internal quotations omitted). The court also correctly noted that "[i]f it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at ¶ 49 (internal quotations omitted).

The court reasonably applied *Strickland* when it determined that Carprue failed to show he was prejudiced by his trial counsel's actions. To prove prejudice, Carprue had to demonstrate there was a reasonable probability that, but for trial counsel's errors, the result of his trial would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

In determining that Carprue was not prejudiced by his trial counsel's actions, the Supreme Court of Wisconsin considered three factors supporting its conclusion. First, the court noted that all the potentially objectionable activity took place outside the presence of the jury, and with respect to the judge's questions posed to Carprue himself, none of the information disclosed was ever presented to the jury. *Carprue*, 2004 WI 111, ¶ 50. Thus, Supreme Court of Wisconsin reasonably concluded that the judge's actions in question and the information disclosed could not have prejudiced the jury. *Id.*

Second, the court noted that Carprue conceded that none of the testimony from Morrow should have been excluded on the grounds of some evidentiary defect. *Id.* at ¶ 51. Nonetheless, Carprue asserts that, but for the trial judge's intervention, none of the testimony from Morrow would have been presented to the jury. Carprue asserts that the judge's calling and questioning Morrow improperly provided a blueprint for the State. (Pet'r Br., 8). However, the court reasonably

concluded that the trial record demonstrates that the State was likely to have called Morrow on rebuttal, even if the judge had not called Morrow as a witness.

> During the State's cross-examination of Carprue, the State asked: "Since when did you ever hear of the Milwaukee Police Department enforcing in-house?" Defense counsel immediately objected, saying: "I'm going to object. *That calls for facts not in evidence.*" (Emphasis added.) These passages indicate that the prosecutor was well aware of the significance of in-house procedures before Judge Schellinger intervened.

*Carprue*, 2004 WI 111, ¶ 52.

Finally, the court concluded that Carprue could not have been prejudiced by his attorney's failure to object to the State calling Morrow as a witness, because none of the objections would have been sustained. As noted above, Carprue conceded that none of Morrow's testimony should have been excluded on the grounds of some evidentiary defect. *Id.* at ¶ 51. Thus, the evidence would have been presented to the jury regardless of whether or not Carprue's trial counsel objected to Morrow's testimony, and Carprue cannot demonstrate that he was prejudiced by his trial counsel's failure to object to such testimony. In light of the foregoing, the court concludes that the Supreme Court of Wisconsin's determination that Carprue failed to show he was prejudiced by his trial counsel's actions was not contrary to, or an unreasonable application of federal law, nor was it unreasonable in light of the evidence presented.

The Supreme Court of Wisconsin noted that Carprue's claims that the trial court proceedings were fundamentally unfair stem from his allegations that the judge was biased, not from allegations that his counsel was ineffective. *Id.* at ¶ 57.

The court then properly considered whether Carprue was denied his constitutional right to an impartial judge. The court concluded that there was no evidence that the trial judge had any direct stake in the outcome of Carprue's trial and that her questioning of him did not manifest actual bias. *Id.* at ¶¶ 60-67.

Carprue does not claim that the trial judge had any direct stake in the outcome of his trial, or harbored an actual or implied bias, but alleges that the trial judge harbored a general bias against defendants. *Id.* at ¶ 60. In determining whether Carprue was denied his constitutional right to an impartial judge, the court applied the correct standard articulated in *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986), which held that disqualification based on general allegations of prejudice or bias would be constitutionally required only in the most extreme cases. *Carprue*, 2004 WI 111, ¶ 60. The court reasonably concluded that the trial judge's conduct did not represent the "extreme" case within the meaning of *Aetna*.

The court correctly presumed that the trial court judge was unbiased. *See Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (stating that public officials are presumed to properly discharge their duties). "Only a strong, direct interest in the outcome of a case is sufficient to overcome that presumption of evenhandedness." *Del Vecchio v. Illinois Dep't of Corrs.*, 31 F.3d 1363, 1373 (7th Cir. 1994). Here, Carprue bases his claim that the trial judge harbored a general bias against defendants on the trial court's actions of calling and questioning Morrow, and in questioning Carprue. The court explained why the specific acts Carprue

complained of were insufficient to establish a claim of judicial bias, and instead were aimed at clarifying some confusion on the record.

> As to calling and questioning Morrow, the record reflects several points of confusion with respect to "in-house" monitoring. The majority of Judge Schellinger's questions to Morrow were directed at clarifying this confusion. While we discourage judicial intervention in this manner if it can be avoided, the fact that Judge Schellinger had taken judicial notice of "In-House" Correctional Services' practices warranted that she assure herself that the information the jury was instructed to accept as fact was accurate. *See* Wis. Stat. § 902.01(7) . Moreover, Judge Schellinger dispelled any uncertainty about her motivation by explaining that she did not intend to imply that Carprue was being untruthful. Instead, she made clear that she was attempting to ascertain what "In-House" Correctional Services' procedures were, wholly apart from what Carprue believed them to be.
> With respect to the file Judge Schellinger obtained, the file was more likely in her possession because she wanted to mitigate any impression the jury might have by virtue of the evidence as to how Carprue and T.B. met, than because she was on a mission to impeach Carprue. As previously stated, Carprue was in the Milwaukee County HOC and then on "in-house" monitoring. Several times Judge Schellinger explained that the jury was not to read anything into those facts. She also explained that Carprue's confinement at the HOC was the result of a traffic offense, to allay suspicion of his involvement in more substantial criminal conduct. While we do not condone the extensive questioning of Carprue about the letter to another judge, we cannot conclude that this action is so "extreme" as to deprive Carprue of due process.

*Id.* at ¶¶ 65-66.

Carprue also asserts that his lengthy sentence is additional evidence of the trial court judge's bias. (Pet'r Br., 11). This evidence was not specifically addressed by the Supreme Court of Wisconsin, however, in denying Carprue's motion for post-conviction relief, the Milwaukee County Circuit Court concluded that the stiff sentence was attributable to Judge Schellinger's judgment of Carprue's "attitude, his smugness, and her concern that he would not abide by the rules our

-14-

community observes and the respect we give women in our community," and was not based on the potentially objectionable actions or a general bias. *State v. Carprue*, Case No. 01CF002532, 6 (Oct. 9, 2002).

A state court decision that is "minimally consistent with the facts and circumstances of the case" constitutes a reasonable determination. *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997). Here, the court concludes that the Supreme Court of Wisconsin reasonably concluded that there was no indication that the trial judge had any personal stake in the outcome of Carprue's trial. The court also concludes that the Supreme Court of Wisconsin's determination that the trial judge's actions were not so extreme as to establish judicial bias or to deprive Carprue of his due process rights, was not contrary to, or an unreasonable application of federal law, nor was it unreasonable in light of the evidence presented. In conclusion, Carprue fails to demonstrate that the Supreme Court of Wisconsin's decision in his case was contrary to, or constituted an unreasonable application of any clearly established U.S. Supreme Court precedent within the meaning of § 2254(d)(1), or demonstrate that the decision resulted in an unreasonable determination of the facts in light of the evidence presented at state court within the meaning of § 2254(d)(2). Thus, under 28 U.S.C. § 2254(d), the court is obliged to deny Carprue's petition for a writ of habeas corpus.

Accordingly,

**IT IS ORDERED** that Carprue's petition for a writ of habeas corpus (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** with prejudice.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this  15th  day of May, 2006.

BY THE COURT:

 s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge